No. 23-108

# United States Court of Appeals for the Federal Circuit

In Re

CREEKVIEW IP LLC,

*Petitioner.*

*On Petition for a Writ of Mandamus to the United States District Court for the District of Delaware in Case Nos. 1:22-cv-426-CFC and 1:22-cv-427-CFC Honorable Colm F. Connolly, Judge*

## BRIEF FOR AMICI CURIAE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA AND LAWYERS FOR CIVIL JUSTICE IN OPPOSITION TO PETITION FOR A WRIT OF MANDAMUS

Daryl Joseffer
  *Counsel of Record*
Jennifer B. Dickey
U.S. CHAMBER LITIGATION CENTER
1615 H St. NW
Washington, DC 20062
*Counsel for Chamber of Commerce of the United States of America and Lawyers for Civil Justice*

December 9, 2022

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, Counsel for the Amici Curiae Chamber of Commerce of the United States of America and Lawyers for Civil Justice certify the following:

1.    The full name of every party or *amicus* represented by us is:

Amicus Curiae Chamber of Commerce of the United States of America

Amicus Curiae Lawyers for Civil Justice

2.    The name of the real party in interest represented by me is:

Not applicable.

3.    All parent corporations and any publicly held companies that own 10% or more of the stock of the party or *amicus* represented by me are:

None

4.    The names of all law firms and the partners or associates that appeared for the party or *amicus* now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

Daryl Joseffer and Jennifer B. Dickey, U.S. Chamber Litigation Center, 1615 H St. NW, Washington, DC 20062

5.    The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

(all cases pending in the District of Delaware unless otherwise noted)

| In re: Nimitz Technologies LLC | 2023-103 (Fed. Cir.) |
|---|---|
| Nimitz Technologies LLC v. CNET Media, Inc. | 1:21-cv-1247-CFC |
| Nimitz Technologies LLC v. BuzzFeed, Inc. | 1:21-cv-1362-CFC |
| Nimitz Technologies LLC v. Imagine Learning, Inc. | 1:21-cv-1855-CFC |

| | |
|---|---|
| Nimitz Technologies LLC v. Bloomberg L.P. | 1:22-cv-0413-CFC |
| Backertop Licensing LLC v. August Home, Inc. | 1:22-cv-00573-CFC |
| Backertop Licensing LLC v. Canary Connect, Inc. | 1:22-cv-0572-CFC |
| Lamplight Licensing LLC v. ABB, Inc. | 1:22-cv-0418-CFC |
| Lamplight Licensing LLC v. Ingam Micro, Inc. | 1:22-cv-1017-CFC |
| Mellaconic IP, LLC v. Timeclock Plus, LLC | 1:22-cv-0244-CFC |
| Mellaconic IP, LLC v. Deputy, Inc. | 1:22-cv-0541-CFC |
| Swirlate IP LLC v. Quantela, Inc. | 1:22-cv-00235-CFC |
| Swirlate IP LLC v. Lantronix, Inc. | 1:22-cv-00249-CFC |
| Waverly Licensing LLC v. AT&T Mobility LLC | 1:22-cv-00420-CFC |
| Waverly Licensing LLC v. Granite River Labs Inc. | 1:22-cv-00422-CFC |

6.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

None.

## STATEMENT OF INTEREST OF AMICI CURIAE

The Chamber of Commerce of the United States of America ("Chamber") is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts, including with regard to the growing practice of third-party litigation funding ("TPLF"). In particular, the Chamber has repeatedly urged legislators, rulemaking bodies and courts to make the practice of TPLF more transparent and, in so doing, has become a leading expert on the subject.

Lawyers for Civil Justice ("LCJ") is a national coalition of defense trial lawyer organizations, law firms, and corporations that advocates for procedural rule improvements to ensure the just, speedy, and inexpensive determination of civil cases. Like the Chamber, LCJ is an expert on TPLF disclosure rules based on its advocacy of rule amendments, both for appellate[1] and district courts,[2] aimed at

---

[1]     *See*, Rules Suggestion to the Advisory Committee on Appellate Rules, September 1, 2022, *available at* https://www.uscourts.gov/sites/default/files/22-apc_suggestion_from_lcj_-_rule_26.1_0.pdf.

[2]     *See*, Rules Suggestion to the Advisory Committee on Civil Rules, September 8, 2022, *available at* https://www.uscourts.gov/sites/default/files/22-cv-m_suggestion_from_lcj_and_ilr_-_rule_16c2_0.pdf.

providing transparency for courts and parties.[3]

---

[3]    Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), counsel for amici curiae states that no counsel for any party authored this brief in whole or in part, and no party or counsel for a party made any monetary contribution intended to fund the preparation or submission of this brief.  No person other than amici curiae, their members, or their counsel made any monetary contribution to the brief's preparation or submission.

# **TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTEREST ................................................................i

STATEMENT OF INTEREST OF AMICI CURIAE ........................... iii

TABLE OF AUTHORITIES ................................................................vi

INTRODUCTION ................................................................................1

FACTUAL BACKGROUND ...............................................................3

      A.    Third-Party Litigation Funding ...............................................3

      B.    The Challenged TPLF Standing Order ....................................7

ARGUMENT ......................................................................................8

I.     DISCLOSURE SHEDS LIGHT ON WHO HAS CONTROL OVER THE LAWSUIT ..............................................................9

II.    DISCLOSURE OF TPLF PREVENTS CONFLICTS OF INTEREST........11

III.   DISCLOSURE OF TPLF FACILITATES SETTLEMENT EFFORTS. ..................................................................13

IV.   DISCLOSURES CAN UNCOVER ATTEMPTS TO MISUSE COURTS IN WAYS THAT THREATEN NATIONAL SECURITY. ........14

CONCLUSION ................................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*3rd Eye Surveillance, LLC v. United States*,
　　158 Fed. Cl. 216 (2022)...................................................................10

*Boling v. Prospect Funding Holdings, LLC*,
　　771 F. App'x 562 (6th Cir. 2019).....................................................9

*Conlon v. Rosa*,
　　Nos. 295907, 295932, 2004 Mass. LCR LEXIS 56
　　(Mass. Land Ct. July 21, 2004) .......................................................9

*Eash v. Riggins Trucking Inc.*,
　　757 F.2d 557 (3d Cir. 1985) .............................................................8

*FastShip, LLC v. United States*,
　　143 Fed. Cl. 700 (2019)............................................................10, 11

*In re National Prescription Opiate Litigation*,
　　No. 1:17-MD-2804, 2018 WL 2127807 (N.D. Ohio May 7, 2018)...............7

*In re Novak*,
　　932 F.2d 1397 (11th Cir. 1991) ........................................................8

*In re Packard*,
　　751 F.3d 1307 (Fed. Cir. 2014) ......................................................10

*Paradise Creations, Inc. v. U V Sales, Inc.*,
　　315 F.3d 1304 (Fed. Cir. 2003) ......................................................11

## STATUTES

35 U.S.C. § 281 ....................................................................................11

Wis. Stat. § 804.01(2)(bg)......................................................................6

vi

# RULE

D.N.J. L. Civ. R. 7.1.1 ........................................................................6

# OTHER AUTHORITIES

*Burford Extends Life of Sovereign Wealth Fund Arrangement and Comments on Fund Management Business*, Burford (May 26, 2022) ...........................15

Case Management Order Regarding Model Leadership Applications for Consumer Track, *In re Marriott International Customer Data Security Breach Litigation*, MDL No. 19-md-2879, ECF No. 171 (D. Md. filed Apr. 11, 2019)...........................................................................7

Christopher Bogart, *Common sense vs. false narratives about litigation finance disclosure*, Burford (July 12, 2018) ...................................................5

Complaint, *White Lilly, LLC v. Balestriere PLLC*, No. 1:18-cv-12404-ALC, ECF No. 1 (S.D.N.Y. filed Jan. 2, 2019).........................................................9

Donald J. Kochan, *Keep Foreign Cash Out of U.S. Courts*, Wall St. J. (Nov. 24, 2022) ............................................................................................15

Hearing Transcript, *In re Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*, MDL No. 3047 (N.D. Cal. Nov. 9, 2022) .................................................................................6

Jacob Gershman, *Lawsuit Funding, Long Hidden in the Shadows, Faces Calls for More Sunlight*, Wall St. J. (Mar. 21, 2018) ..................................13

John H. Beisner et al., *Selling More Lawsuits, Buying More Trouble*, U.S. Chamber Institute for Legal Reform (Jan. 2020) ...................................3

Litigation Funding Agreement, *Gbarabe v. Chevron Corp.*, No. 14-cv-00173-SI, ECF No. 186-4 (N.D. Cal. Sept. 16, 2016) ...................................10

Louis D. Brandeis, *Other People's Money* (1933) ...................................................16

Maya Steinitz, *The Litigation Finance Contract*, 54 Wm. & Mary L. Rev. 455 (2012)...................................................3, 4, 5, 9

Maya Steinitz, *Whose Claim is This Anyway? Third-Party Litigation Funding*,
95 Minn. L. Rev. 1268 (2011) ........................................................15

Michael E. Leiter & John H. Beisner et al., *A New Threat: The National Security Risk of Third Party Litigation Funding*, U.S. Chamber Institute for Legal Reform (Nov. 2022) ...................................4, 15

Robert Huffman & Robert Salcido, *Blowing the Whistle on Qui Tam Suits and Third-Party Litigation Funding: The Case for Disclosure to the Department of Justice*, 50 Pub. Cont. L.J. 343 (2021) ..........................4, 5, 12

Roger Parloff, *Have You Got a Piece of this Lawsuit?*, Fortune (June 13, 2011) .......................................................12, 14

Standing Order for all Judges of the Northern District of California, Contents of Joint Case Management Statement ...............................................6

Suneal Bedi & William C. Marra, *The Shadows of Litigation Finance*, 74 Vand. L. Rev. 563 (2021) ..........................................................3

*Survey of Federal and State Disclosure Rules Regarding Litigation Funding* (Feb. 7, 2018) ..........................................................5

Thomas Holzheu et al., *U.S. Litigation Funding and Social Inflation: The Rising Costs of Legal Liability*, Swiss Re Institute (Dec. 2021) .................4, 5

Tripp Haston, *The Missing Key to 3rd-Party Litigation Funding*, Law360 (Feb. 7, 2017) ..........................................................12

Victoria Shannon Sahani, *Judging Third-Party Funding*, 63 UCLA L. Rev. 388 (2016) ..........................................................12

# INTRODUCTION

Amici seek to address a single narrow (but fundamental) question raised by the Petition: whether issuance of the challenged Standing Order Regarding Third-Party Litigation Funding Arrangements ("Standing Order") was an abuse of discretion warranting the issuance of a writ of mandamus. The answer is clearly no. Far from abusing his discretion, Chief Judge Colm Connolly properly did what a growing number of courts are doing, which is inquiring whether cases over which he is presiding are being funded through third-party litigation finance ("TPLF") – the practice by which non-parties pay money to a litigant or his counsel in exchange for a contingent interest in proceeds from the litigation. Specifically, the Standing Order requires a party to identify any such funder financing its lawsuit, to specify whether such a funder's approval is necessary for litigation or settlement decisions, and to briefly describe the nature of the financial interest of the funder. (*See* APPX004-005.) Asking these rudimentary questions falls well within the scope of a district court's inherent authority to promote the fair and efficient administration of justice in several key respects.

*First*, the disclosure of TPLF (including whether someone with a contingent financial interest in the suit is controlling or influencing litigation or settlement decisions) helps shed light on who is driving the litigation and whether litigation is potentially being employed for an improper purpose. Although Petitioner asserts

that it, as a purportedly bona fide patentee, is the real-party-in-interest in this case, whether that is so does not render the existence of TPLF irrelevant to either the district court (which has the right to know if undisclosed non-parties have a direct stake in the outcome of the litigation) or the defendants (who have a right to know who their accusers are).

*Second*, identifying those with a contingent financial interest in a litigation helps the court reduce potential conflicts of interest given that some funders are publicly traded and those that are not may be comprised of elaborate networks of owners and personnel.  Absent disclosure, a district judge could unwittingly sit in judgment of a case in which he or she has a financial or personal interest, creating a conflict of interest or the appearance of impropriety.

*Third*, identification of TPLF is relevant to settlement – the cost and difficulty of which necessarily increase with litigation funding in light of the need for a claimant to pay off both its lawyer *and the funder*.  Disclosure of the mere fact of TPLF enables the court and defendants to more accurately evaluate settlement prospects and to better calibrate resolution initiatives.

*Fourth*, disclosure of TPLF may also unearth potential threats to U.S. national and economic security to the extent that a case is being funded by foreign money – e.g., sovereign wealth funds, which are increasingly a source of lawsuit funding in this country.  Judges have a right to know whether foreign governments (including

2

potential adversaries) are using their courtrooms for improper purposes, and disclosing the existence of TPLF will help courts answer that fundamental question.

These are just some of the legal, ethical and public policy reasons justifying the disclosure of TPLF in civil litigation.[4]  And the fact that Petitioner does not identify any downside of such disclosure, much less explain how it could possibly have been harmed by answering a few simple questions about TPLF usage, confirms that Petitioner's challenge of the Standing Order is entirely without merit.

## FACTUAL BACKGROUND

### A.    Third-Party Litigation Funding

"Litigation finance is the practice where a third party provides capital to a litigant or law firm in connection with a legal claim."  Suneal Bedi & William C. Marra, *The Shadows of Litigation Finance*, 74 Vand. L. Rev. 563, 570 (2021). "Unheard of yesterday, it is a mainstay today," *id.* at 565, becoming so ubiquitous that the RAND Institute for Civil Justice has "dubbed it one of the '. . . most influential trends in civil justice.'"  Maya Steinitz, *The Litigation Finance Contract*, 54 Wm. & Mary L. Rev. 455, 459 (2012) (quoting RAND Corp., *Third-Party Litigation Funding and Claim Transfer*, at 11 (June 2, 2009)).    The key

---

[4]    For a comprehensive examination of TPLF (including these and other reasons why TPLF should be disclosed in civil cases), *see* John H. Beisner et al., *Selling More Lawsuits, Buying More Trouble*, U.S. Chamber Institute for Legal Reform (Jan. 2020).

distinguishing feature of TPLF is that it is generally provided on a "non-recourse" basis, meaning that any repayment to the funder is contingent on the outcome of a particular lawsuit or portfolio of litigation. *See* Robert Huffman & Robert Salcido, *Blowing the Whistle on Qui Tam Suits and Third-Party Litigation Funding: The Case for Disclosure to the Department of Justice*, 50 Pub. Cont. L.J. 343, 348 (2021).

The focus of this brief is on investment TPLF, which includes the financing of large-scale tort and commercial cases, such as disputes relating to intellectual property that are pervasive in the U.S. District Court for the District of Delaware. *See* Steinitz, *supra*, at 460. "Investors in this type of TPLF include hedge funds, private equity firms, endowments, family offices, and even sovereign wealth funds, 'attracted by excess returns that are largely uncorrelated with macroeconomic risks.'" Michael E. Leiter & John H. Beisner et al., *A New Threat: The National Security Risk of Third Party Litigation Funding*, U.S. Chamber of Commerce Institute for Legal Reform, at 3 (Nov. 2022) (citation omitted).

Although TPLF originated abroad, a 2021 Swiss Re Institute report indicates that the U.S. is now the world's largest TPLF market and accounted for more than half (52 percent) of the $17 billion investment into litigation funding globally in 2021. *See* Thomas Holzheu et al., *U.S. Litigation Funding and Social Inflation: The Rising Costs of Legal Liability*, at 3, Swiss Re Institute (Dec. 2021). The same report predicts that TPLF investment will continue to grow and could reach $31 billion by

2028.  *Id.* at 8; *see also* Huffman & Salcido, *supra*, at 348 ("TPLF has grown by leaps and bounds in the past decade"; "private funders active in the [United States] have a whopping $9.52 billion under management for commercial case investments.") (citation omitted).

"But this growing industry is shrouded in secrecy."  Steinitz, *supra*, at 461. According to a February 2018 research memo prepared by the Federal Judicial Center at the request of the federal Advisory Committee on Civil Rules, the local rules of six U.S. Courts of Appeals and "a quarter of all federal district courts" include some form of disclosure requirement that would cover TPLF arrangements. *Survey of Federal and State Disclosure Rules Regarding Litigation Funding*, at 1 (Feb. 7, 2018) ("Survey").  However, the local rules of the District of Delaware and the Federal Circuit currently have no such TPLF-related disclosure requirements, *see* Appendix B to Survey, and the rules in place in other jurisdictions, at least according to funders, "do not appear to be much-followed or enforced," Christopher Bogart, *Common sense vs. false narratives about litigation finance disclosure*, Burford (July 12, 2018).

To increase the transparency of TPLF, a growing number of district courts and individual judges are requiring the disclosure of TPLF arrangements.  Most recently, the U.S. District Court for the District of New Jersey adopted a local rule expressly requiring parties to disclose, at the outset of a case: the identity of the

5

funder, the nature of the financial interest it has in the litigation, and whether its approval is necessary for litigation or settlement decisions. *See* D.N.J. L. Civ. R. 7.1.1. The Northern District of California also requires the disclosure of TPLF arrangements in putative class actions. *See* Standing Order for all Judges of the Northern District of California, Contents of Joint Case Management Statement, § 19. At the state level, Wisconsin has gone further, requiring the production of actual funding agreements themselves at the outset of a civil lawsuit. *See* Wis. Stat. § 804.01(2)(bg) (2018).

Beyond these requirements, individual judges are also increasingly issuing orders or making inquiries about TPLF. For example, just last month, Judge Yvonne Gonzalez Rogers of the U.S. District Court for the Northern District of California orally asked each attorney seeking a leadership position in the recently established social media addiction multi-district litigation ("MDL") proceeding to divulge in open court whether they are using (or plan to use) TPLF. Hr'g Tr. 12:21-24, *In re Soc. Media Adolescent Addiction/Pers. Injury Prods. Liab. Litig.*, MDL No. 3047 (N.D. Cal. Nov. 9, 2022) ("I want to know explicitly whether you use [TPLF] or intend to use it in this case."). Judge Paul W. Grimm of the U.S. District Court for the District of Maryland has also required lawyers leading an MDL proceeding concerning a data breach of Marriott hotels to make similar disclosures. *See* Case Mgmt. Order Regarding Model Leadership Appls. for Consumer Track at 2-3, *In re*

*Marriott Int'l Customer Data Sec. Breach Litig.*, MDL No. 19-md-2879, ECF No. 171 (D. Md. filed Apr. 11, 2019).  And another judge overseeing a large swath of federal opioid cases, Judge Dan A. Polster of the U.S. District Court for the Northern District of Ohio, also required that lawyers connected with the cases disclose the existence of any third-party funding.  *See In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2018 WL 2127807, at *1 (N.D. Ohio May 7, 2018).

> **B.    The Challenged TPLF Standing Order**

Similar to the District of New Jersey's local rule, the Standing Order requires the disclosure of certain basic TPLF-related information.  It does not require the production of any funding agreement itself.  (*See* APPX004-005.)  Specifically, the Standing Order requires disclosure of: (1) the identity and address of the funder; (2) whether the funder's approval is necessary for "litigation or settlement decisions" and, if so, the nature of the terms and conditions relating to that approval; and (3) a brief description of the nature of the financial interest of the funder.  (*Id.*)  The Standing Order also authorizes "additional discovery of the terms" of the funding agreement "upon a showing that the [funder] has authority to make material litigation decisions or settlement decisions, the interests of any funded parties or the class . . . are not being promoted . . . conflicts of interest exist . . . or other such good cause exists."  (APPX005.)

7

## ARGUMENT

"That courts have inherent powers—powers vested in the courts upon their creation and not derived from any statute—is not disputed." *Eash v. Riggins Trucking Inc.*, 757 F.2d 557, 561 (3d Cir. 1985) (citations omitted), *superseded in non-relevant part by statute*. Employing these powers, courts "have developed a wide range of tools to promote efficiency in their courtrooms and to achieve justice in their results." *Id.* at 564 (court had inherent authority to assess the cost of jury impaneling against attorney who reached a settlement with an adversary immediately prior to trial but remanding to assess whether proper notice was provided); *see also In re Novak*, 932 F.2d 1397, 1406 (11th Cir. 1991) (inherent powers are "essential to the administration of justice") (citation omitted).

That is exactly what Chief Judge Connolly did by entering the Standing Order, essentially adopting the same kind of modest disclosures that federal courts are increasingly requiring. As explained below, these disclosures safeguard the fair and efficient administration of justice by: (1) revealing whether the plaintiff or a financially interested non-party is controlling the lawsuit; (2) preventing conflicts of interest; (3) promoting effective and realistic settlement discussions; and (4) uncovering potential misuse of the courts in ways that threaten national and economic security interests.

## I.    DISCLOSURE SHEDS LIGHT ON WHO HAS CONTROL OVER THE LAWSUIT.

The Standing Order enables the district court to ascertain whether the plaintiff (as opposed to a financially interested non-party) is controlling the lawsuit. As one court warned in requiring disclosure, "[h]e who pays the piper may not always call the tune, but he'll likely have an influence on the playlist." *Conlon v. Rosa*, Nos. 295907, 295932, 2004 Mass. LCR LEXIS 56, at *5-8 (Mass. Land Ct. July 21, 2004). The few TPLF agreements that have come to light demonstrate that this warning was well-grounded because, unsurprisingly, TPLF entities have the right to control and influence the litigation matters in which they invest. *See, e.g.*, *Boling v. Prospect Funding Holdings, LLC*, 771 F. App'x 562, 579 (6th Cir. 2019) (invalidating funding agreements on state-law champerty grounds because they "effectively g[a]ve [the TPLF entity] substantial control over the litigation" by limiting the plaintiff's right to change counsel and requiring the plaintiff to execute documents or pay filing fees to protect the funder's interest); Compl. ¶ 35, *White Lilly, LLC v. Balestriere PLLC*, No. 1:18-cv-12404-ALC, ECF No. 1 (S.D.N.Y. filed Jan. 2, 2019) (TPLF entity alleging that its counsel breached her obligation to serve as the funder's "'ombudsman' to oversee the cases it ultimately invested in, and to *ensure* that the [lawsuits] asserted viable claims and were litigated properly and efficiently") (emphasis added); Steinitz, *supra*, at 472 (highlighting funding agreement utilized by Burford Capital in litigation against Chevron, which

9

"provide[d] control to the Funders" through the "installment of 'Nominated Lawyers'" – lawyers "selected by the Claimants with the Funder's approval"); Litigation Funding Agreement §§ 1.1, 10.1, *Gbarabe v. Chevron Corp.*, No. 14-cv-00173-SI, ECF No. 186-4 (N.D. Cal. Sept. 16, 2016) (funding agreement referencing a "Project Plan" for the litigation developed by counsel and the funder with restrictions on counsel deviation, particularly with respect to hiring only identified experts).

Although the specter of funder control is concerning in any civil case, it is particularly troubling in patent litigation, which "can occasionally be susceptible to abuse." *FastShip, LLC v. United States*, 143 Fed. Cl. 700, 717 (2019) (citing *In re Packard*, 751 F.3d 1307, 1325 & n.21 (Fed. Cir. 2014)) (Plager, J., concurring) *vacated and remanded on other grounds*, 8 F.3d 1335 (Fed. Cir. 2020).  The Court of Federal Claims has repeatedly recognized that a reasonable response to this risk is the "*disclosure*" of TPLF-related information, which "encourage[s] transparency and ensure[s] a shadow broker is not using litigation as a form of harassment." *Id.*; *see also 3rd Eye Surveillance, LLC v. United States*, 158 Fed. Cl. 216, 228-29 (2022) (ordering discovery related to litigation funders in light of *FastShip*).

Petitioner argues that Congress has "disallowed such inquiries" into TPLF (Pet. at 15), but the statute and caselaw Petitioner cites do not even address the issue of TPLF, much less even remotely suggest that limited court-imposed disclosures

10

on that topic are improper. Rather, Petitioner's authority merely addresses its purported status as a bona fide patentee – i.e., that it has a "remedy by civil action for infringement of [the] patent." (*Id.* (quoting 35 U.S.C. § 281).) *See also Paradise Creations, Inc. v. U V Sales, Inc.*, 315 F.3d 1304, 1310 (Fed. Cir. 2003) (cited in Pet. at 16) (holding that plaintiff did not "have enforceable rights to the patent and did not have standing to assert federal jurisdiction"). That issue is fundamentally separate from the question whether a district court has the inherent authority to make limited inquiries about potential third-party contingent financial interests in the litigation the court is overseeing – the latter of which is being undertaken with increasing frequency both within and outside the patent context.

## II. <u>DISCLOSURE OF TPLF PREVENTS CONFLICTS OF INTEREST.</u>

The Standing Order guards against conflicts of interest by requiring the disclosure of the persons/entities with a direct financial stake in the outcome of the litigation. *See FastShip, LLC*, 143 Fed. Cl. at 717 ("Disclosure also enables judges to appropriately evaluate potential recusal due to conflicts of interest."). As one commentator succinctly explained:

> As some [funding] entities are multibillion- and multimillion-dollar publicly traded entities, requiring disclosure of their role will allow judges to determine whether they have a conflict of interest in administering a case. And for privately held [funding] entities, the web of personal relationships judges [or other judicial officers] have could be impacted as well, leading to unintentional appearances of impropriety.

11

Tripp Haston, *The Missing Key to 3rd-Party Litigation Funding*, Law360 (Feb. 7, 2017); *see also* Victoria Shannon Sahani, *Judging Third-Party Funding*, 63 UCLA L. Rev. 388, 401 (2016) ("[C]onflicts of interest may arise if a judge or arbitrator is personally or professionally linked to the third-party funder.").

These concerns are "not merely hypothetical," Huffman & Salcido, *supra*, at 356 n.98, as illustrated by a racketeering suit against Steven Donziger, who had helped secure a fraudulent $18.2 billion judgment against Chevron Corporation on behalf of Ecuadorians allegedly harmed by the company's drilling practices. *See* Roger Parloff, *Have You Got a Piece of this Lawsuit?*, Fortune (June 13, 2011). During a deposition in that proceeding, Donziger was asked to identify the company that had helped finance the underlying suit against Chevron, "if for no other reason than that the parties could be assured that all the U.S. judges around the country who were hearing aspects of the case had no relationship with the investor that might disqualify them from acting in those roles." *Id.* Upon being ordered to answer the question by the special master assigned to the case, Donziger disclosed that the funder was in fact Burford Capital – one of the largest funders in the world. *Id.*

As the special master explained, the disclosure "prove[d] the wisdom of [his] ruling," necessitating several disclosures of his own. *Id.* Specifically, the special master disclosed that Burford's chief investment adviser, Jon Molot, "was a co-counsel of [his], may still be"; another member of Burford's board was a personal

friend and longtime former colleague; and Molot had previously invited the special master to consider joining Burford's board. *Id.* The special master did not recuse himself from the racketeering litigation, and the parties did not insist that he do so. Nonetheless, he made clear that the deposition "prove[d] that it is imperative for lawyers to insist that clients disclose who the investors are." *Id.*

## III.  <u>DISCLOSURE OF TPLF FACILITATES SETTLEMENT EFFORTS.</u>

The Standing Order promotes more meaningful and efficient settlement discussions. A party that must pay a litigation funder a percentage of its recovery may be inclined to reject what might otherwise be a fair settlement offer in the hopes of securing a larger sum of money. Indeed, as an executive of a prominent TPLF company previously acknowledged, litigation funding "make[s] it *harder and more expensive* to settle cases." Jacob Gershman, *Lawsuit Funding, Long Hidden in the Shadows, Faces Calls for More Sunlight*, Wall St. J. (Mar. 21, 2018) (emphasis added) (quoting Allison Chock of IMF Bentham, now known as Omni Bridgeway). Notably, some TPLF agreements that have become public illustrate this reality, revealing that TPLF entities often structure their agreements to maximize their take of the first dollars of any recovery, thereby deterring reasonable settlements.

For example, in the Chevron Ecuador litigation previously discussed, the funding agreement included a "waterfall" repayment provision, which provided for a heightened percentage of recovery on the first dollars of any award. Under the

agreement, Burford would receive approximately 5.5% of any award, or about $55 million, on any amount starting at $1 billion. *See* Parloff, *supra*. If the plaintiffs settled for less than $1 billion, the investor's percentage would actually go up, giving Burford the same payout it would have received if there had been a $1 billion recovery. *Id.* In other words, the express terms of the funding agreement – penalizing plaintiffs if they settled for less than $1 billion – necessarily "affect[ed] settlement decisions." *Id.*

The disclosures required by the Standing Order specifically shed light on whether the funder's "approval is necessary for . . . settlement" and, if so, "the nature of the terms and conditions relating to that approval." (APPX004-005.) These disclosures allow both the court and defendants to more accurately evaluate settlement prospects and to better calibrate settlement initiatives. In addition, transparency allows the court to structure settlement protocols with greater potential to succeed, including inviting a funder with influence or control over settlement decisions to attend any mediation. Absent disclosure of TPLF usage, the funder's presence as a player in the settlement process likely will remain hidden, undermining settlement negotiations between the parties.

## IV.   DISCLOSURES CAN UNCOVER ATTEMPTS TO MISUSE COURTS IN WAYS THAT THREATEN NATIONAL SECURITY.

Finally, disclosure of TPLF usage may also help unearth whether courts are being misused by foreign actors in a manner that harms U.S. national and economic

security.  *See generally* Leiter & Beisner, *supra*, at 1; *see also* Donald J. Kochan, *Keep Foreign Cash Out of U.S. Courts*, Wall St. J. (Nov. 24, 2022).  Although it is impossible to pinpoint the precise extent of foreign investment in U.S. civil cases given the secrecy that enshrouds the TPLF industry, such foreign investment is occurring, as sovereign wealth funds (i.e., state-owned and operated investment funds) are becoming increasingly involved in TPLF.  For example, Burford Capital has partnered with an undisclosed sovereign wealth fund at least since 2018 and recently extended this partnership through 2023.  *Burford Extends Life of Sovereign Wealth Fund Arrangement and Comments on Fund Management Business*, Burford (May 26, 2022).

Given the growth of partnerships between litigation funders and state actors, foreign adversaries, such as China, Iran, and Russia, could seek to exploit the U.S. civil justice system by employing TPLF in ways that threaten U.S. national and economic security.  A leading TPLF expert has warned "that the China Investment Corporation (CIC), China's Sovereign Wealth Fund, [could] fund[] a suit against an American company in a sensitive industry such as military technology" and, in the process, "obtain[] highly confidential documents containing proprietary information regarding sensitive technologies from the American defendant-corporation."  Maya Steinitz, *Whose Claim is This Anyway? Third-Party Litigation Funding*, 95 Minn. L. Rev. 1268, 1270 (2011).  Foreign actors could also use TPLF to unfairly gain a

competitive advantage over the United States by encouraging or exploiting dubious lawsuits against U.S. businesses in defense and other highly sensitive sectors. *See* Leiter & Beisner, *supra*, at 12-13.

As Justice Brandeis recognized, "[s]unlight is said to be the best of disinfectants." Louis D. Brandeis, *Other People's Money* 62 (1933). If foreign adversaries know that investing in U.S. litigation will become a matter of public record, they may think twice before attempting to insert themselves into the U.S. civil justice system. At a minimum, the kind of disclosures contemplated by the Standing Order will at least shine some light on the role courts might unwittingly be playing in these potential threats by illuminating the extent to which foreign sources of money are being used to finance lawsuits in the District of Delaware.

In short, there are multiple independent legal, ethical and policy reasons justifying Chief Judge Connolly's Standing Order in his cases. Not only did the district court have the discretion to enter that order, but it will serve as a blueprint for other courts seeking to bring about greater transparency around TPLF. Accordingly, to the extent this Court seeks to address the element of the Petition challenging the Standing Order, it should uphold it.

## CONCLUSION

For the foregoing reasons, amici respectfully request that the Court deny the Petition.

December 9, 2022

Respectfully Submitted,

*/s/ Daryl Joseffer*
Daryl Joseffer
  *Counsel of Record*
Jennifer B. Dickey
U.S. CHAMBER LITIGATION CENTER
1615 H St. NW
Washington, DC 20062
*Counsel for Chamber of Commerce
of the United States of America and
Lawyers for Civil Justice*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system on December 9, 2022.

A copy of the foregoing was served upon the following counsel of record by electronic mail and upon the district court by Federal Express:

Via Email to counsel for Plaintiffs:

David R. Bennett, Direction IP Law, P.O. Box 14184, Chicago, IL 60614, dbennett@directionip.com

Via Email to counsel for Defendants:

Chad S.C. Stover, Barnes & Thornburg LLP, 1000 North West Street, Suite 1500, Wilmington, DE 19801, chad.stover@btlaw.com

Glenn R. Bronson, J. Jeffrey Gunn, and James C. Watson, Trask Britt P.C., 230 South 500 East, Suite 300, Salt Lake City, UT 84101, GRBronson@traskbritt.com, JGunn@traskbritt.com, JCWatson@traskbritt.com

Anne Shae Gaza, Young, Conaway, Stargatt & Taylor LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, agaza@ycst.com

Matthew J. Rizzolo, Scott A. McKeown, Brendan McLaughlin, Ropes & Gray, 2099 Pennsylvania Ave, NW, Washington, DC 20006-6807, matthew.rizzolo@ropesgray.com, scott.mckeown@ropesgray.com, brendan.mclaughlin@ropesgray.com

Via Federal Express to the Court:

The Honorable Colm F. Connolly
J. Caleb Boggs Federal Building
844 N. King Street
Unit 31

Room 4124
Wilmington, DE 19801-3555

December 9, 2022

*/s/ Daryl Joseffer*
Daryl Joseffer
  *Counsel of Record*
Jennifer B. Dickey
U.S. CHAMBER LITIGATION CENTER
1615 H St. NW
Washington, DC 20062

# **CERTIFICATE OF COMPLIANCE**

Counsel certifies as follows:

1.      This brief complies with the type-volume limitations of Federal Circuit Rule 21(e) because this brief contains 3,816 words, excluding the parts of the brief exempted by Rule 32(f) of the Federal Rules of Appellate Procedure.

2.      This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type-style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2019 in 14-point Times New Roman font.